# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | | |
|---|---|---|---|
| PAMELA KIRK STUMP, | ) | | |
| | ) | | |
| Plaintiff, | ) | Civil Action No. 7:13cv00462 | |
| v. | ) | | |
| | ) | | |
| WACHOVIA GROUP LONG TERM | ) | | |
| DISABILITY PLAN, | ) | By: | Michael F. Urbanski |
| | ) | | United States District Judge |
| Defendant. | ) | | |
| | ) | | |

## <u>MEMORANDUM OPINION</u>

This case, brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 <u>et seq.</u>, is before the court on cross motions for summary judgment. The parties have fully briefed the issues and the court heard argument on May 9, 2014. For the reasons set forth below, plaintiff's motion for summary judgment (Dkt. # 12) will be **DENIED** and defendant's motion for summary judgment (Dkt. # 15) will be **GRANTED**.

## I.

Plaintiff Pamela Kirk Stump seeks review of the decision by defendant Wachovia Group Long Term Disability Plan ("the Plan"), terminating her long term disability ("LTD") benefits. Stump worked for Wachovia Bank, National Association, for seventeen years until she stopped working due to her alleged medical conditions in 2009. By virtue of her employment, she was eligible to participate in the Plan, a self-insured employee welfare benefit plan within the meaning of ERISA. Wachovia was the Plan Sponsor of the Plan until December 31, 2008, when Wells Fargo & Company acquired Wachovia and became the Plan Sponsor and Plan Administrator. Third-party Liberty Life Assurance Company of Boston ("Liberty Life") serves as Claims Administrator. Liberty Life does not insure plan benefits.

On December 31, 2009, Stump stopped working due to her alleged medical conditions. She was approved for short-term disability benefits and thereafter received LTD benefits under the Plan for 24 months, from June 30, 2010 through June 29, 2012.[1] For these first 24 months, the Plan defines disability as "the Participant's inability to perform all of the material and substantial duties of his or her own occupation on an Active Employment basis because of an Injury or Sickness." (WF-102680.[2]) The Plan determined that Stump met this definition of disability and paid her benefits during this period.

After 24 months, however, the Plan's definition of disability changes to "the Participant's inability to perform all of the material and substantial duties of his or her own or any other occupation for which he or she is or becomes reasonably fitted by training, education, and experience because of an Injury or Sickness." (Id.) Importantly, the Plan provides that benefits for disability due to mental illness will not exceed 24 months unless the participant is hospitalized, confined or institutionalized. (WF102699-700.) In this suit, Stump challenges the Plan's denial of her claim for benefits after the first 24 months, from June 30, 2012 onward.[3]

## II.

Stump stopped working as a phone service representative due to alleged chronic pain, degenerative disc disease, arthritis, fibromyalgia and depression. (WF-100047, 100049.) The record contains numerous medical opinions as to Stump's functional ability to work given her impairments. These opinions are summarized below.

---

[1] Citing claims notes from June 2010 (WF-100037), defendant asserts Stump was awarded LTD benefits "based on her mental nervous condition." Def.'s Br., Dkt. # 16, at 6 ¶ 17.
[2] Citations are to the administrative record supplied by Wells Fargo. See Dkt. # 9.
[3] Stump is currently 57 years old. She alleges that, under the Plan, she should receive benefits until her 65th birthday. See Dkt. # 1, Ex. A at 6.

2

**A.**

Stump was treated for her medical conditions primarily by four providers:  Dr. Henry Ivey, her primary care physician; Dr. Cyrus Bahkit, her pain management doctor; Dr. Jitendra Desai, her psychiatrist; and Ms. Carla Barnett, her licensed professional counselor.

Dr. Ivey has consistently opined that Stump is disabled from all work.  In May 2010, Dr. Ivey stated that Stump was "unable to perform any work 4/26/09 [for] approx. 2 to 3 years due to chronic persistent pain[;] no heavy lifting, pushing, pulling or twisting[;] no sitting or standing for prolonged periods."  (WF-101011.)  Later, on November 18, 2010, Dr. Ivey opined that Stump was "completely disabled / will not be able to return to work" due to "persistent back pain."  (WF-100790.) [4]  He again stated she could not engage in "lifting, bending, prolonged sitting or standing." (Id.)  Dr. Ivey wrote a brief letter on April 6, 2011, addressed "To whom it may concern," stating he was treating Stump for medical problems including carpal tunnel syndrome and noting that Stump "remains disabled for medical reasons."  (WF-100740.)  On January 19, 2012, Dr. Ivey filled out a form for Liberty Life, indicating Stump was unable to return to work.  (WF-100446.)  In March of 2012, Dr. Ivey filled out a Medical Source Statement of Ability to Do Work-Related Activities in connection with Stump's claim for social security disability benefits.  On that form, Dr. Ivey stated Stump could lift 10 pounds occasionally, less than 10 pounds frequently, stand and/or walk less than 2 hours in an 8-hour workday, sit less than 2 hours in an 8-hour workday, never climb, balance, kneel, crouch, crawl or stoop, and only occasionally reach, handle, finger and feel.  (WF-100172-75.) He indicated yet again that Stump was "totally disabled."  (WF-100175.)

Stump's pain management specialist, Dr. Bahkit, opined on November 11, 2010 that Stump could perform sedentary work with the following restrictions:  "sitting 20 min., standing 10 min., walking 20 min., avoid overhead activities [and] repeat bending."  (WF-100834.)   On December 1,

---

[4] Although Dr. Ivey checked the box indicating that Stump is able to perform sedentary work occupationally on a full-time basis, the entirety of his form makes clear that he believes Stump is disabled from all work.

2011, Dr. Bahkit filled out a form for Liberty Life, indicating Stump was unable to return to work. (WF-100524.) In connection with Stump's claims for social security benefits, Dr. Bahkit filled out a Medical Source Statement of Ability to Do Work-Related Activities, which indicated she could lift and carry less than 10 pounds; stand and/or walk 4 hours in an 8-hour day; sit 4 hours in an 8-hour day; never climb, crouch, crawl or stoop; and only occasionally balance or kneel. Dr. Bahkit placed no restrictions on her ability to reach, handle, finger or feel. He indicated she would be absent from work more than three times per month on account of her medical impairments and treatment. (WF-100202.)

With respect to Stump's alleged mental impairments, Dr. Desai, her treating psychiatrist, did not fill out any forms indicating her functional ability to work. Rather, he responded to requests by stating, "I am not the driver of this bus! Why do I need to fill out these forms?" and "I didn't take her out of work." (WF-100857, 101029.)

LPC Carla Barnett stated on a restrictions form in June 2010 that Stump may be able to return to work at a future date after December 2010, referring the reader to doctor's notes for physical and mental restrictions, including poor memory, lethargy, depression and panic attacks. (WF-100966.) Barnett also stated that Stump exhibited disorganized behavior, irritable and sad mood, was easily distracted and had memory problems, had very little energy and pain. (Id.) In a Functional Mental Status Evaluation form filled out on November 11, 2010, Barnett noted that Stump was slightly unkempt; she appeared anxious, depressed, dysphoric; she had adequate judgment and insight; she had poor concentration and could perform minimal daily functioning. Barnett stated Stump could not perform in any work settings and pegged her Global Assessment of Functioning at 55.[5] (WF-100820-22.)

---

[5] The Global Assessment of Functioning, or GAF, scale ranges from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Diagnostic & Statistical Manual of

4

**B.**

Beginning in early 2011, Liberty Life referred Stump's claim to numerous independent physicians for multidisciplinary panel reviews. The first such review was conducted by Dr. Eric Kaplan, who is Board Certified in neurology and psychiatry, and Dr. Mark Kaplan, who is Board Certified in physical medicine and rehabilitation. In his January 7, 2011 report, Dr. Eric Kaplan concluded based on his review of the medical documentation that Stump did not have any impairment or restrictions from working on a full-time basis secondary to any psychiatric condition. (WF-100768.) Dr. Eric Kaplan stated the most recent documentation was consistent with mild depressive and anxiety symptoms. He noted improvement in Stump's cognitive abilities on September 14, 2010. (Id.) Dr. Eric Kaplan observed that while the record reflects Stump's subjective complaints of cognitive impairment, the only objective evidence in the record was a mini-mental state exam with a score of 29/30. (Id.)

In his report of the same date, Dr. Mark Kaplan found that the following work restrictions are necessary due to Stump's carpal tunnel syndrome: lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; restrict repetitive wrist motion activities bilaterally up to eight times per hour; restrict repetitive keying bilaterally up to 15 keystrokes/minute to 30 minutes continuously and to a total of up to two hours in an eight-hour day; restrict feeling, fingering, gripping, and using light tools (i.e, pen and scissors) bilaterally to a total of up to two hours in an eight-hour day, allowing a five minute break every 20 minutes; restrict in total extremes of wrist flexion or extension bilaterally. (WF-100784.)

---

Mental Disorders 32 (4th ed.1994). A GAF of 51–60 indicates than an individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational or school functioning ..." Id. at 34.

5

The claim notes indicate that based on these reports, Stump's claim was managed based on physical, rather than mental, impairments from this point forward.[6] (WF-100028.)

In 2012, Liberty Life referred Stump's claim to Dr. Enrique Olivares, who is Board Certified in psychiatry, and Dr. Raymond Chagnon, who is Board Certified in physical medicine and rehabilitation, for a multidisciplinary review. In a report dated February 13, 2012, Dr. Olivares concluded that there is no evidence of psychiatric impairment related to Stump's psychiatric diagnoses of depression and anxiety. (WF-100439-40.) He notes there is no evidence of cognitive impairment and that the last treatment note from Dr. Desai on September 15, 2011 indicated her condition was stable. (WF-100440.)

For his part, Dr. Chagnon determined that Stump is able to sit for two hours at a time before needing to change position for three to five minutes for a total of eight hours in a workday; stand for one hour at a time before needing to change positions for three to five minutes, for a total of three hours in an eight hour workday; walk for thirty minutes at a time before needing to change positions for three to five minutes, for a total of two hours in an eight hour workday; lift and carry 20 pounds occasionally and 10 pounds frequently; reach above her shoulders and below her waist level occasionally; perform occasional fingering, forced motor grasp, and fine motor grasp; occasionally bend, squat and stoop; and frequently kneel. (WF-100430.) Dr. Chagnon stated: "The duration of these supported restrictions and limitations is six months and after six months she will need a re-evaluation to see if there have been any changes in her impairments, restrictions and limitations." (Id.)

---

[6] The court notes that in mid-2011, Stump was referred by Dr. Ivey to William Wellborne, Ph.D., for a neuropsychological evaluation to assess any neurocognitive deficits associated with Stump's complaints of having difficulty with her memory and thinking. Although he did not opine as to Stump's ability to work, Dr. Wellborne stated that from a cognitive perspective, her memory was "quite good" and that, aside from some difficulty with complex visual sustained attention and fine motor speed in her right hand, her cognitive domains were within normal limits. (WF-100474.)

6

Liberty Life sent Dr. Chagnon's report to Stump's treating physicians, Dr. Ivey and Dr. Bahkit, for their review and comments concerning the restrictions and limitations imposed by Dr. Chagnon. (WF-100406-10.) Liberty Life did not receive a response from either doctor.

In March 2012, Stump's file was referred to certified vocational counselor Tamara Hite for a transferable skills analysis and vocational evaluation. Basing her analysis on the opinions of Drs. Olivares and Chagnon, Hite determined that Stump could perform work as an information clerk (mall or airport) or a gate guard (badge checker). (WF-100399-401.)

In April of 2012, the Social Security Administration awarded Stump benefits based on its determination that she was totally disabled as of December 29, 2009. (WF-100160.)

On June 1, 2012, Liberty Life sent a letter to Stump informing her that based on the medical and vocational reviews, she did not meet the definition of disability under the Plan beyond June 29, 2012. (WF-100373-77.) Stump appealed this decision to Liberty Life and submitted additional medical records in support of that appeal by letter dated November 26, 2012. (WF-100155-162.) Stump's claim was assigned to a nurse case manager, Barbara Keaveney, for review. The nurse case manager reviewed the claim file and additional medical records submitted on appeal and noted there was no basis for altering the decision to terminate her benefits as of June 29, 2012 on the basis of any psychiatric impairments. With respect to physical impairments, the nurse case manager stated: "In the setting of multiple diagnoses inclusive of [carpal tunnel syndrome], low back pain, migraines, [nurse case manager] recommends …pain management review to assess severity of condition." (WF-100005.) As such, Stump's claim was referred to Dr. Ephraim K. Brenman for peer review.

In his report dated February 11, 2013, Dr. Brenman found there was no physical functional impairment supported by the medical evidence and therefore no restrictions from a physical medicine and rehabilitation/pain perspective. (WF-100142.) Dr. Brenman went on to state that Stump's carpal tunnel syndrome was mild, at worst, per the electromyography testing, and there was

7

no recent documentation to show she has functional examination findings of carpal tunnel syndrome. As for her back pain, Dr. Brenman noted there were no findings on the MRI scan of any significant central or foraminal stenosis; rather, she has very mild anterolisthesis of L4 on L5 with no significant radicular pain and no functional examination findings of radiculopathy. There are only very mild degenerative changes on MRI of the cervical and thoracic spine. (WF-100142.) Dr. Brenman concluded: "In my medical opinion, the claimant can sustain a full-time capacity, particularly a sedentary level of duty from 6/30/12." (Id.)

By letter dated February 13, 2013, Liberty Life upheld its decision to terminate Stump's LTD benefits as of June 29, 2012. Liberty Life stated it had reviewed the medical records Stump submitted on appeal and found they reflect that Stump "continues to receive treatment for her physical and psychological conditions. They document substantially similar findings to those contained in the records that were previously received and reviewed . . . ." (WF-100134.) Liberty Life also noted the findings of Dr. Brenman on peer review and held that "the available information does not contain physical or mental status exam findings, diagnostic test results or other forms of objective medical evidence substantiating that Ms. [Stump's] symptoms remained of such severity that they resulted in restrictions or limitations rendering her unable to perform the duties of any occupation after [June 29, 2012]." (WF-100135.)

Stump appealed this decision to the Wachovia LTD Appeal Committee, once again submitting additional medical records in a letter dated April 10, 2013. (WF-100069-72.) The Appeal Committee enlisted the assistance of two more reviewing physicians to conduct peer reviews—Dr. Todd Graham, who is Board Certified in physical medicine and rehabilitation and in pain management, and Dr. Kathleen Seibel, who is Board Certified in psychiatry.

In his May 15, 2013 report, Dr. Graham stated that:

> Medical records do not support impairment from 6/30/12 to present. There are no objective findings of physical limitations

8

noted. There are extensive medical records that were provided for review, but all note that she continues to go for various injections, facet blocks, epidural injections, trigger point injections and rhizotomy. There are no therapy notes or functional capacity exam that would indicate what her functional limits currently are. There is no documentation that she could not work full time, 40 hours per week, 8 hours per day with sedentary work restrictions. A functional capacity exam would be helpful to determine what exact limitations are warranted and if maximal effort is being given.

(WF-102614-15.)

Likewise, Dr. Seibel concluded in her report that the medical records do not support psychiatric impairment from June 30, 2012 to the present. (WF-102608.) She states Dr. Desai's records reflect normal mental status, no cognitive problems, and stable chronic depression. (Id.) There is no evidence of decompensation or a need for hospitalization, and the records indicate she is caring for grandchildren, which "clearly requires someone to be functioning at a level that they are able to take care of children." (WF-102609.) She continued:

Neuropsychological testing done on May 12, 2011, and June 8, 2011, was normal. It does indicate she tends to somaticize; however, neither the social worker nor the psychiatrist have noted in their diagnoses nor in their treatment that she has somatization disorder leading to impairment. There are findings in the report that she could be inwardly more troubled by self-doubt and misgivings about her adequacy than is apparent on the surface. Certainly, this can be a therapeutic issue that someone might deal with in therapy if they chose to; however, this is not an issue that indicates psychiatric impairment or a psychiatric disorder that would lead to restrictions and/or limitations.

(Id.)

By letter dated May 29, 2013, the Wachovia LTD Appeal Committee informed Stump that it upheld the denial decision rendered by Liberty Life. The letter stated:

[Stump's] entire appeal file was reviewed by an independent physician. All of the available medical documentation furnished, in addition to the Liberty claim file, was reviewed. After review of the LTD appeal file, the Committee determined the medical evidence does not support her inability to perform all of the material and

9

substantial duties of her own or any other occupation as of June 30, 2012.

(WF-102593.)  This ERISA action followed.

### III.

When reviewing the denial of benefits in a case brought under ERISA,[7] the court applies "a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  In determining whether a plan provision for benefits is discretionary, the scope of that contractually conferred discretion and whether the fiduciary acted within that scope, the court acts de novo.  Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 341 (4th Cir. 2000).  If the court finds that the plan confers discretion on a fiduciary and the fiduciary acted within the scope of that discretion, the court will only overturn the denial of benefits if it constitutes an abuse of discretion.  See id.

The plain language of the Plan at issue in the instant case gives the Plan Administrator "the exclusive right and the sole discretionary authority to interpret the terms and provisions of the Plan and to resolve all questions arising thereunder, including, without limitation, the authority to determine eligibility for Benefits and the right to resolve and remedy ambiguities, inconsistencies, or omissions in the Plan."  (WF-102706.)  This language expressly confers discretionary authority to the Plan Administrator.  See Woods v. Prudential Ins. Co. of Am., 528 F.3d 320, 322 (4th Cir. 2008) ("In applying Firestone, we have held that an ERISA plan can confer discretion on its administrator

---

[7] This matter is before the court on cross motions for summary judgment.  "However, in actions brought under ERISA, summary judgment is 'merely the conduit to bring the legal question before the district court and the usual tests of summary judgment . . . do not apply.'" Tobey v. Keiter, Stephens, Hurst, Gary & Shreaves, No. 3:13-CV-315, 2014 WL 61325, at *3 (E.D. Va. Jan. 7, 2014) (citing Keith v. Fed. Exp. Corp. Long Term Disability Plan, No. 7:09cv00389, 2010 WL 1524373, at *10 n.4 (W.D. Va. Apr. 15, 2010)).

10

…by language which 'expressly creates discretionary authority'"). Thus, the court will apply an abuse of discretion standard of review.[8]

Under this standard, "a trustee's discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." Booth, 201 F.3d at 341. The court must not substitute its own judgment in place of the judgment of the Plan Administrator. Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 630 (4th Cir. 2010). "An administrator's decision will be considered reasonable if it is 'the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" Winebarger v. Liberty Life Assurance Co. of Boston, 571 F. Supp. 2d 719, 722 (W.D. Va. 2008) (quoting Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Richardson v. Perales, 402 U.S. 389, 401 (1971), and consists of "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In Booth, the Fourth Circuit identified the following eight nonexclusive factors that a court may consider in determining whether a denial constitutes an abuse of discretion: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. 201 F.3d at 342-43.

With this framework in mind, the court examines the facts of the instant case.

---

[8] At oral argument, Stump conceded that the appropriate standard of review in this case is abuse of discretion.

11

## IV.

This case turns on whether Stump met the criteria for continued long-term disability benefits beginning June 30, 2012, after her initial 24 months of disability. The parties agree that she did not qualify for a continuation of benefits based on her mental impairments, because she was not hospitalized, confined or institutionalized, as required under the Plan.[9] (See WF-102699-700.) The only issue, then, is whether she met the definition of disability under the Plan as a result of her physical impairments—that is, whether she was unable to perform the duties of her own or any occupation for which she is reasonably qualified. Stump argues that the Plan Administrator's decision to deny her benefits as of June 30, 2012 is unreasonable and not supported by substantial evidence. The court cannot agree.

### A.

Stump focuses her argument on the third <u>Booth</u> factor, the adequacy of the materials considered to make the decision and the degree to which they support it. Stump contends that the Plan Administrator's decision to deny benefits was unreasonable because "Wells Fargo failed to provide to the three providers it relied upon in its denial with complete copies of the medical records in its claim file." Pl.'s Br., Dkt. # 13, at 9. Stump refers specifically to records attached to letters dated November 26, 2012 and April 10, 2013 filed by counsel in connection with Stump's appeals.

Stump is correct that Drs. Chagnon, Olivares and Brenman, upon whose opinions Liberty Life relied in denying Stump's claim for benefits, did not have before them all of the medical evidence that is currently in the record. Drs. Chagnon and Olivares each rendered opinions in February 2012, well before additional medical records were submitted by counsel on November 26,

---

[9] Stump appears to have conceded this point at oral argument.

2012 and April 10, 2013. It can hardly be considered unreasonable for the Plan not to provide Drs. Chagnon and Olivares with records they had not yet received.

Dr. Brenman, on the other hand, issued his opinion on February 11, 2013, after counsel sent the first set of new medical records to Liberty Life. The crux of Stump's argument on appeal is that Dr. Brenman should have had the benefit of reviewing the medical records submitted by counsel on November 26, 2012. Stump points out that Dr. Brenman stated in his report, "[t]here is no recent documentation that the claimant truly has functional examination findings of carpal tunnel syndrome." (WF-100142.) Stump suggests the documentation Dr. Brenman was looking for is in the medical records he did not have before him. Because Liberty Life relied on Dr. Brenman's opinion in denying Stump's appeal (WF-100128-36) and Dr. Brenman did not have all of the available evidence to review, Stump argues the Plan Administrator's decision is unreasonable.

This argument is flawed for several reasons. First, while Dr. Brenman may not have had before him the medical records submitted by counsel in November 2012, Liberty Life did. This new evidence was reviewed by a nurse case manager and by Liberty Life on appeal. (See WF-100134.) Liberty Life's letter denying Stump's appeal specifically stated it received and had considered the additional medical evidence submitted on November 26, 2012. (WF-100133.) Liberty Life found that these records "document substantially similar findings to those contained in the records that were previously received and reviewed, periodically referencing tenderness, diminished range of motion, depression, irritability, distractibility and worry." (WF-100134.)

Indeed, contrary to Stump's assertions, this medical evidence fails to document the "functional examination findings of carpal tunnel syndrome" that Dr. Brenman noted were lacking in the record. Stump complained to doctors at the University of Virginia Health System on May 5, 2011 of "electric shooting pain in the wrist when she is doing something like washing dishes, feeding the horses, taking something out of the oven." (WF-100224.) Yet a physical examination revealed

13

"[n]o pain, tenderness, or synovitis in her DIP, PIP, MCP, wrists, elbows, hips, knees, ankles, and her MTP compression tests was negative." She was noted to be "[d]iffusely tender," however. (WF-100225.) Dr. Ivey's treatment notes reflect a diagnosis of carpal tunnel syndrome but state the condition is stable. (WF-100288, 304.) [10] On a March 13, 2012 residual functional capacity form, Dr. Ivey indicated Stump could occasionally handle, finger and feel, explaining her "fingers are numb." (WF-100174.) Dr. Bahkit indicated on the same form, however, that Stump had an unlimited ability to handle, finger and feel. (WF-100201.) On July 27, 2012 Stump reported to the nurse practitioner at the Carilion Rheumatology Clinic that she "[h]as been told she has bilateral Carpal Tunnel. Did have EMG that showed CTS 'more than 5 years ago' per pt report." (WF-100314.) Examination revealed Stump had normal grip, normal motion in her wrist and no swelling in joints. (WF-100317.) She was told to "[w]ear wrist splints as discussed" and to follow up with Dr. Ivey if she experiences worsening symptoms." (WF-100314.) This medical evidence does not contain functional examination findings of carpal tunnel syndrome, notwithstanding Stump's argument to the contrary.

In any event, Liberty Life did not rely solely on Dr. Brenman's opinion in denying Stump's appeal. Rather, it considered all of the evidence of record, including the evidence submitted in November 2012, in upholding its decision to discontinue her LTD benefits. Furthermore, Stump's claim was reviewed at yet another level of the appeals process by the Wachovia LTD Appeal Committee. In connection with this appeal, Dr. Graham reviewed all of the medical evidence, including the records submitted by counsel in both November 2012 and April 2013, and concluded "[m]edical records do not support impairment from 6/30/12 to present." (WF-102614.)

---

[10] Additionally, an August 13, 2012 note addressed "Dear Sirs" from Dr. Ivey states: "Please be advised that we are following Mrs. [Stump] for several medical problems including Carpal Tunnel Syndrome. She remains disabled for medical reasons." (WF-100338.)

To that end, Stump argues Dr. Graham requested a functional capacity evaluation and the Plan Administrator failed to provide one. In his report, Dr. Graham stated, "[a] functional capacity exam would be helpful to determine what exact limitations are warranted and if maximal effort is being given," as "[t]here are no therapy notes or functional capacity exam that would indicate what her functional limits currently are." (WF-102615.) Although he indicated a functional capacity exam "would be helpful," Dr. Graham found the medical evidence did not suggest that Stump "could not work full time, 40 hours per week, 8 hours per day with sedentary work restrictions." (Id.) "[A] plan administrator has no duty to develop evidence that a claimant is not disabled prior to denying benefits." Piepengarten v. Old Dominion Freight Line, Inc., 395 F. App'x 950, 957 (4th Cir. 2010). The Plan language provides that the Plan Administrator has the right and opportunity to have a claimant examined by a physical or vocational expert of its choice but is under no obligation to do so. (WF-102703.) As such, it was not unreasonable for the Wachovia LTD Appeal Committee to uphold the decision of Liberty Life based on its review of the entire record and the opinion of Dr. Graham.[11]

## B.

In the same vein, Stump argues that the Plan Administrator's decision is unreasonable because the vocational expert did not have the benefit of the additional evidence submitted by counsel and, thus, did not have a complete picture of Stump's functional capacity.[12] "[A] plan is not

---

[11] At the May 9th hearing, Stump argued that the decision of the Wachovia LTD Appeal Committee is unreasonable because the denial letter does not refer to Dr. Graham's opinion, and Stump is entitled to know the doctors' opinions on which the Plan Administrator relies. While the Appeal Committee's letter may not refer to Dr. Graham by name, it plainly states that Stump's "entire appeal file was reviewed by an independent physician. All of the available medical documentation furnished, in addition to the Liberty claim file, was reviewed." (WF-102593.) Additionally, this denial letter contains language taken word-for-word from Dr. Graham's report. (WF-102594.) Under these circumstances, Stump cannot argue she was not aware that the Appeal Committee relied on Dr. Graham's opinion.

[12] Stump also argues that "the Plan failed to address with its reviewing physicians whether the frequency of medical treatment or the nature of the symptoms would require absence from work more than 2 days per month on average," which would preclude all work. Pl.'s Br., Dkt. # 13, at 11. This question is inherent in the issue to be decided by the reviewing physicians—to what extent do Stump's impairments limit her ability to work? Stump points to no provision of the Plan she claims has been violated, and the court does not find the Plan Administrator's decision to be unreasonable on these grounds.

15

required as a matter of law to obtain vocational or occupational expertise in its evaluation of an employee's claim." <u>Piepengarten</u>, 395 F. App'x at 957. Nor does the Plan language require it. (WF-102703.) In this case, the Plan Administrator chose to enlist the services of a vocational expert, and she conducted her review on March 9, 2012. The vocational expert based her review on the physical capacity assessments of Drs. Chagnon (physical) and Olivares (mental), the most recent peer review opinions available at the time. The record was subsequently reviewed by Drs. Brenman and Graham, each of whom found that no physical impairment prevented Stump from working after June 29, 2012. The Plan Administrator was under no obligation to obtain a second vocational evaluation based on the new evidence submitted by counsel in November 2012 and April 2013. <u>See</u> <u>Elliott v. Sara Lee Corp.</u>, 190 F.3d 601, 608 (4th Cir. 1999) ("Given the extensive medical record before the Appeal Committee, Sara Lee was under no obligation to secure additional vocational evidence." (citing <u>Berry v. Ciba–Geigy Corp.</u>, 761 F.2d 1003, 1008 (4th Cir.1985))). Moreover, the medical evidence does not suggest a new evaluation was necessary. While Stump continued to complain of pain, some records reflect she reported doing better, experiencing a reduction in pain, and being more active than usual. (<u>See, e.g.</u>, WF-100180, 196, 224; WF-102627.) An August 14, 2012 MRI of her lumbar spine was unremarkable. (WF-100190.) Notes reveal her concentration and memory were intact. (WF-102627, 29.) At the very least, this evidence indicates her condition remained stable. On this record, the court cannot find the Plan Administrator's reliance on the vocational evaluation unreasonable.

Stump further argues the two jobs the vocational expert identified, information clerk and gate guard, cannot be performed with the restrictions given by Dr. Chagnon. Pl.'s Br., Dkt. # 13, at 11. Attaching printouts from the Dictionary of Occupational Titles and O-Net as exhibits to her brief, Stump contends the gate guard position is light duty work and the information clerk requires

more than occasional fingering, neither of which Stump can do per Dr. Chagnon. Defendant argues it is not appropriate for the court to consider this evidence as it was not before the Plan Administrator and is not contained in the record. In determining whether a court can consider extrinsic evidence, the Fourth Circuit has "focused on whether evidence was known to the administrator when it rendered its decision, not whether it was part of the administrative record." Helton v. AT&T Inc., 709 F.3d 343, 352 (4th Cir. 2013). Stump counters that the court can take judicial notice of these publicly available documents. However, she makes no showing that this evidence was known to the Plan Administrator at the time it rendered its decision. Cf. Webster v. Black & Decker (U.S.) Inc., 33 F. App'x 69, 74 n.6 (4th Cir. 2002) (declining to consider Social Security Administration benefits determination letter that was not part of the administrative record). Regardless, Stump is asking the court to substitute its own factual findings based on job descriptions pulled off of the internet for the expertise of the vocational evaluator, who is skilled in these matters and was specifically asked in this case to opine as to the jobs available to Stump given the limitations identified by Dr. Chagnon. That the court cannot do.

## C.

At oral argument, the court raised the additional question of whether Stump's award of disability benefits by the Social Security Administration serves as evidence of procedural unreasonableness and unfairness.[13] This issue implicates the eighth Booth factor—the fiduciary's motives and any conflict of interest it may have. 201 F.3d at 342-43.

In Metropolitan Life Insurance Company v. Glenn, 554 U.S. 105, 116 (2008), the United States Supreme Court held that "conflicts are but one factor among many that a reviewing judge must take into account" in ERISA cases. The Court found that the Sixth Circuit Court of Appeals properly weighed the conflicts presented in that case under a "combination-of-factors method of

---

[13] The court gave the parties leave to file additional information concerning this issue. Both parties submitted letters to the court, which will be docketed in this case.

17

review." Id. at 118. In so doing, the Court recognized the existence of conflict where a Plan Administrator encourages a claimant "to argue to the Social Security Administration that she could do no work, receive[s] the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignore[s] the agency's finding in concluding that [the claimant] could in fact do sedentary work." 554 U.S. at 118. In Glenn, the Court found that "[t]his course of events was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the [Sixth Circuit] in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous)." Id. Citing the Supreme Court's decision in Glenn, the Fourth Circuit held in Piepengarten that "the court must consider whether the Plan's treatment of the SSA determination, i.e., requiring Appellant to apply for SSA disability income benefits as a condition to receipt of benefits under the Plan, and then concluding that he is not disabled, [w]as potential evidence of procedural unreasonableness and unfairness." 395 F. App'x at 958.

In the instant case, the Plan Administrator encouraged—indeed, required—Stump to apply for disability benefits through the Social Security Administration. In its June 28, 2010 letter awarding Stump long-term disability benefits, Liberty Life stated:

> Considering the medical and vocational information in your file, it appears you may be eligible to receive Social Security Disability Benefits. Social Security is an insurance program that you pay for by working and paying FICA taxes. In essence your FICA taxes are the insurance premiums. Social Security covers individuals in the form of retirement, life, and disability insurance.
>
> ***
>
> If you are approved for Social Security Disability Benefits, the disability benefits you receive from Liberty will be reduced by the amount receive[d] under Social Security. (An exception is Social Security Cost of Living increases, which are yours to keep.) In other words, you will continue to receive the same amount of monthly benefits, but the money will come from two sources.

18

> Part of my job is to help you obtain Social Security Disability benefits if you are entitled to them. However, you must initiate the process . . . . As we discussed, under the terms of Wachovia Corporation's Group Disability Plan, you are required to apply for Social Security benefits. Therefore, within 45 days, please initiate your application, complete the enclosed forms and return them to me, along with a copy of the receipt of application that you receive from Social Security.
>
> It is important that you begin this process immediately because if we do not receive all of the documents listed above within 45 days of the date of this letter, we will reduce your long-term disability benefit by the amount you may be eligible to receive from Social Security. We estimate that you would receive $1,126.00 in Social Security Disability benefits. This means that, if you do not provide these documents, your benefit from Liberty will be reduced from $1731.18 to $605.18.
>
> Please notify me immediately when you are awarded Social Security Disability Benefits. Typically you will receive a significant retroactive payment from Social Security shortly thereafter. Much of this money is essentially money that Liberty advanced to you while you were waiting for Social Security's decision, and you must repay it immediately.

(WF-100958-59.)

Nevertheless, defendant asserts this case is distinguishable from Glenn because the Plan Administrator did not ignore the fact that Stump had received social security disability benefits in determining she was no longer eligible for LTD benefits. In its February 13, 2013 letter denying Stump's appeal, Liberty Life explained, "an award of Social Security Disability Benefits is not determinative of entitlement to benefits under the specific terms and conditions of the Wachovia Corporation Long Term Disability Plan." (WF-100136.) Indeed, in this case, "[t]here is no indication that the definition of 'total disability' under the Plan in any way mirrors the relevant definition under the regulations of the SSA." Elliott v. Sara Lee Corp., 190 F.3d 601, 607 (4th Cir. 1999).

Even if there was a conflict here, it is but one factor for the court to consider. Glenn, 554 U.S. at 116; see also Elliott, 190 F.3d at 607 ("We made clear in Brogan that, while the ALJ's finding

19

could be considered as evidence, it was not determinative."). Viewed in light of all eight <u>Booth</u>

factors, the court cannot find the Plan Administrator acted unreasonably in this case. The Plan

Administrator's decision to deny Stump benefits as of June 30, 2012 was the product of a deliberate,

principled reasoning process. Both Liberty Life and the Appeals Committee fully reviewed Stump's

medical records and the opinions of her treating physicians. At each stage of the claims and appeal

processes, they arranged for independent reviews of Stump's physical and mental impairments by

board-certified doctors. There were eight such reviews in total.[14] The evidence supports the Plan

Administrator's denial of Stump's claim for continued benefits. <u>See</u> <u>Piepengarten</u>, 395 F. App'x at

958. To the extent the Plan's treatment of Stump's award of social security benefits does create a

conflict of interest, it is the sole "indicium of unreasonableness." <u>Id.</u> On this record, the court

cannot find the Plan Administrator abused its discretion.

**V.**

> Where an ERISA administrator rejects a claim to benefits on the strength of substantial evidence, careful and coherent reasoning, faithful adherence to the letter of ERISA and the language in the plan, and a fair and searching process, there can be no abuse of discretion—even if another, and arguably a better, decision-maker might have come to a different, and arguably a better, result.

<u>Evans v. Eaton Corp. Long Term Disability Plan</u>, 514 F.3d 315, 325-26 (4th Cir. 2008). In this case,

the Plan Administrator's decision to discontinue Stump's LTD benefits beginning June 30, 2012 was

deliberate, principled, well-reasoned, and based on substantial evidence. As such, it will be upheld.

---

[14] The fact that these reviewing physicians' opinions conflicted with the opinions of Stump's treating physicians is of no moment. "The Fourth Circuit has held that it is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented." <u>Elliott v,</u> 190 F.3d at 606 (citing <u>Ellis v. Metropolitan Life Ins. Co.,</u> 126 F.3d 228, 234 (4th Cir. 1997) & <u>Brogan v. Holland,</u> 105 F.3d 158, 162–63 (4th Cir. 1997)). Additionally, no special weight need be given to the opinions of Stump's treating physicians in this ERISA case. <u>Evans v. Eaton Corp. Long Term Disability Plan,</u> 514 F.3d 315, 324-25 (4th Cir. 2008) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." (quoting <u>Black & Decker Disability Plan v. Nord,</u> 538 U.S. 822, 834 (2003))).

Accordingly, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted. An appropriate Order will be entered to that effect.

Entered: September 30, 2014

*Michael F. Urbanski*

Michael F. Urbanski
United States District Judge